**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

————————————————————

DEBORA BURFORD,                )
                               )
          Plaintiff,           )
                               )
     v.                        )          Case No. 15-cv-2074 (RMC)
                               )
JANET L. YELLEN, CHAIR,        )
BOARD OF GOVERNORS OF THE      )
FEDERAL RESERVE SYSTEM         )
                               )
Defendant.                     )
————————————————————)

**MEMORANDUM OPINION**

DeBora Burford was a law enforcement officer in the Law Enforcement Unit of the Board of Governors of the Federal Reserve System from 2002 until February 2012.  Ms. Burford alleges that she suffered discrimination due to her sex and age and was retaliated against after she asked the Board to investigate the alleged discrimination.  She also complains that she was discharged because of false retaliatory charges.  She sues Janet L. Yellen, Chair of the Board of Governors, in her official capacity.  The Board moves to dismiss the Amended Complaint or, alternatively, for summary judgment.

**I. FACTS**

At the relevant time, Ms. Burford was approximately 50 years old.  As a result, she was, and is, protected from employment discrimination based on her sex by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (2012), and from discrimination based on her age by the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq*.  Both laws also protect employees from retaliation because they engaged in activities in

1

furtherance of equal employment opportunities.  42 U.S.C. § 2000e-3(a) ("Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings"); *Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (holding ADEA 29 U.S.C. § 633(a) precludes retaliation based on the filing of an age discrimination complaint).

Ms. Burford was hired as an officer in the Law Enforcement Unit (LEU) of the Board in December 2002, after a reduction in force at the District of Columbia Department of Corrections (DC DOC) where she had previously been employed as a corrections officer.  She gained the rank of senior law enforcement officer and served as a "lead" officer in 2009.  While she had earlier filed charges alleging a lack of equal employment opportunity (EEO), this case concerns a series of workplace incidents that began in late 2009 and which Ms. Burford alleges constituted discrimination because of her sex, age, and EEO activity.

Starting in December 2009, Ms. Burford complains that she was repeatedly confronted by a probationary female officer, Shandra Love, who put Ms. Burford in fear for her physical safety.  The first of those incidents occurred on December 1, 2009, when Ms. Love, "in a seemingly unprovoked verbal assault," called Ms. Burford a "b_tch."  Am. Compl. ¶ 12.  Ms. Love has admitted using the epithet to address Ms. Burford at a time when Ms. Love was talking to LEU Sergeant Frank Williams on her cell phone.  *Id*. ¶ 13.  "With her cell phone to her ear, Love took what appeared to be an aggressive fighter's stance while [Ms. Burford] sat inside the guard booth bracing for what could have [led] to a physical assault against her."  *Id*. ¶ 15.  On a later date, Ms. Love "made unprovoked false accusations that [Ms. Burford] bumped her in the back . . . ."  *Id*. ¶ 24.  Ms. Burford alleges that a subsequent incident occurred when Ms. Love falsely claimed that when the two women were in the locker room, Ms. Burford "intentionally brushed [Ms. Love's] hair with her buttocks as Love leaned over her purse," and that Ms. Love

then "engaged in a barrage of aggressive obscenities against [Ms. Burford], who in fear of physical attack, continued to face her locker and prepare for dayshift roll call." *Id.* ¶¶ 28, 30. The Amended Complaint alleges that these "false accusations came after [Ms. Burford] wrote a statement to [the dayshift watch commander, Lieutenant Larence] Dublin alleging that Love was not checking the identifications of vehicle occupants [who] were attempting to enter the Board through the East Court, which was Love's primary responsibility." *Id.* ¶ 25.  Lt. Dublin allegedly did not investigate Ms. Burford's complaints about Ms. Love, and provided false testimony in the later EEO investigation.  *Id.* ¶¶ 21, 22, 23.  He also failed to discipline Ms. Love in a manner that Ms. Burford felt appropriate.  *See id.* ¶¶ 18, 21, 23, 33.  Both Lt. Dublin and Ms. Love were younger than 40 at the time of these incidents.  Ms. Burford alleges that unidentified harassing conduct towards her from Ms. Love and/or Lt. Dublin "became a condition of [her] continued employment."  *Id.* ¶ 35.

These confrontations with Ms. Love and Lt. Dublin's inaction led Ms. Burford to initiate internal EEO proceedings in August 2010, in which she alleged discrimination due to her sex and age.  *Id.* ¶ 26. *See also id.* ¶ 120 (alleging that "she filed her EEO complaint after LEU managers failed to address Love's aggressive and potentially violent behaviors").  These conflicts continued after Ms. Burford contacted an EEO Counselor at the Board.  *See Id.* ¶ 36. The Amended Complaint alleges that Ms. Love and Lt. Dublin made false allegations against Ms. Burford during the EEO investigation, during which EEO Counselor Johanna Bruce also interviewed LEU Chief Billy Sauls and Senior Employee Relations Specialist Keisha Hargo, both of whom also allegedly gave false testimony detrimental to Ms. Burford.  *Id.* ¶¶ 25, 26, 27, 28, 29, 38, 39.  Ms. Burford further alleges that Ms. Love "admitted that she and Dublin were in

constant communication with one another with regard to [Ms. Burford], and that the communication was personal in nature." *Id.* ¶ 129.

For approximately two months between August and October 2010, LEU Administrative Sergeant Michelle Tillery-Fuller consistently assigned Ms. Burford to daily posts that required Ms. Burford to stand for her work shift, carrying "the hefty UP-40 submachine gun, with the weapon's strap painfully digging into Plaintiff's shoulder, when no other LEU officers were forced to endure such abuse." *Id.* ¶ 44.  Ms. Burford alleges that, as a lead officer and one of only two women LEU leads, she was entitled to seated posts typically filled by lead officers, but which Sgt Tillery-Fuller assigned to male non-lead officers. *Id.* ¶¶ 46, 48.  These standing assignments did not result in any decrease in Ms. Burford's pay or other benefits and did not constitute a demotion.  Standing assignments are part of lead officer duties; Ms. Burford alleges, however, that she was assigned a disproportionate number of them on every shift for approximately two months, which "was not normal for any LEU officer." *Id.* ¶ 44.  She further alleges that she was "the only female lead officer meeting the ADEA's age limit criteria who had been removed from her lead officer position" and replaced with men who were not lead officers. *Id.* ¶ 48, and that she was "the only lead officer who had engaged in protected activity at the time of her removal from the Lead Officer Program." *Id.* ¶ 49.  Additionally, the Amended Complaint alleges that Sgt. Tillery-Fuller "stated in her deposition that she doesn't know why [Ms. Burford] wasn't assigned to lead posts" and "only admits to discriminating against [Ms. Burford] after [Sgt. Tillery-Fuller] bec[ame] aggressive and disturbingly upset with Ellen Opper-Weiner," then-counsel to Ms. Burford, during the Sergeant's deposition. *Id.* ¶ 50.  Sgt. Tillery-Fuller "angrily" testified in deposition that she removed Ms. Burford "from the Lead Officer Program . . . because [Ms. Burford] was not communicating with officers, which were false allegations made

only by Love and Dublin." *Id.* ¶ 51.  It is alleged that Sgt. Tillery-Fuller knew of Ms. Burford's EEO activities at that time. *Id.* ¶ 40.

In addition to the standing shift assignments, Ms. Burford alleges that she was discriminated and retaliated against when she was blamed for the release of a confidential document she had written for the Board's use to an outside attorney representing an employee suing the Agency. *Id.* ¶ 60.  On August 26, 2010, Ms. Burford was aggressively questioned by Chief Sauls and Ms. Hardo for approximately an hour. *Id.* ¶ 66, 72.  Both interrogators "claimed that it was [Ms. Burford] who released the document to the non Board [sic] attorney." *Id.*  Ms. Burford complains that Mr. Sauls and Ms. Hargo "threatened to obtain a warrant to seize [Ms. Burford's] home computer.  [She] was also threatened with disciplinary action if she did not confess to disclosing the document to the non Board [sic] attorney when Sauls and Hargo both were aware that it was Sauls that committed the act he and Hargo were accusing [Ms. Burford] of committing." *Id.* ¶ 67.  Ms. Burford was not placed on administrative leave or otherwise disciplined following the interview and she was ultimately exonerated. *Id.* ¶ 75.  She alleges, however, that it was Chief Sauls who had released the document to the Legal Department which, in turn, handed it over to the employee's outside counsel, and that Chief Sauls therefore had prior knowledge that Ms. Burford was not the source of the "leak" when he questioned her severely. According to the Amended Complaint, Ms. Burford "was a reasonable employee who found the retaliatory actions taken against her to be materially adverse" and therefore violative of Title VII and the ADEA.  Id. ¶ 92.

Ms. Burford requested EEO investigations of the above instances of alleged discrimination, and all were ultimately considered, but rejected, by the Equal Employment Opportunity Commission (EEOC) on September 13, 2015, in its review of an Administrative

Judge's grant of summary judgment to the Agency.   *See* Mot. to Dismiss Ex. A (EEOC Dec.)

[Dkt. 17-1] at 2 ("Upon the required de novo review of the record, we find that the grant of

summary judgment was proper.").

   Ms. Burford alleges additional instances of discrimination beyond those

considered by the EEOC.  She alleges that her car was vandalized in September 2010 at her

home in Waldorf, Maryland and a note was found that explicitly told her to stop her EEO

activity.  Am. Compl. ¶¶ 83, 84; *see also* Opp. [Dkt. 19] Ex. D (sign reading "B_tch your car is

just the beginning!!!!  Stop the complaints at the Federal Reserve or else you will be next! I hope

we are clear on this!").  A second car in Waldorf was also vandalized in September 2010; the

second car belonged to former LEU Master Senior Officer Sabrina Bullock, who also had

ongoing EEO activity at the Board.  Am. Compl. ¶ 85.  Ms. Burford alleges that Chief Sauls

falsely reported to the Board's Office of Inspector General (OIG) and to Employee Relations that

Ms. Burford had herself vandalized both vehicles.  *Id.* ¶ 90.

   According to the Amended Complaint, Chief Sauls and OIG Senior Special Agent

Albert Pleasant conspired "with malicious intent" in September 2010 to allege that Ms. Burford

"had engaged in a fictitious cell phone spoofing scandal," that had caused her to be named as a

suspect by law enforcement.  *Id.* ¶ 91.  As part of this conspiracy, Agent Pleasant is alleged to

have unlawfully obtained Ms. Burford's personal cellular phone records that he and Chief Sauls

then shared with non-law-enforcement personnel at the Board.  It is further alleged that Agent

Pleasant and Charles Country Sheriff's Detective Higgs banged on Ms. Burford's door at about

10:00 p.m. on May 23, 2011; Agent Pleasant attempted to enter by tugging on the storm door;

Agent Pleasant reported this incident to the OIG by email; and Agent Pleasant unsuccessfully

attempted to have Ms. Burford falsely prosecuted in Stafford County, the District of Columbia, and the District of Maryland "for the fictitiously alleged spoofing scandal." *Id.* ¶¶ 97-101.

Ms. Burford was terminated on December 8, 2011 for her purported involvement in the cell phone spoofing scandal and for the vandalism on her car and Ms. Bullock's vehicle. *Id.* ¶¶ 103&104.  Her termination was carried out as an alleged "intentional act to humiliate" Ms. Burford, as it occurred where LEU officers reporting for roll call might have observed it.  *Id.* ¶¶ 112-114.  The stated reasons for her termination are alleged to be pretextual to hide retaliation. *Id.* ¶ 103.  Although she was immediately placed on leave on December 8, 2011, the effective date of Ms. Burford's termination was February 29, 2012.

Additionally, Ms. Burford argues that Board Senior Counsel John Kuray prevented Mses. Burford and Bullock from adding retaliatory car vandalism to their ongoing EEO complaints "due to the threatening notes referencing the Board that were found at the crime scenes." *Id.* ¶ 109.  She adds that Mr. Kuray "also prevented" her timely claim of wrongful termination "from being added to her ongoing EEO activity" even though it was "submitted to the Board by [her counsel] Ellen Opper-Weiner." *Id.* ¶ 111.

Finally, Ms. Burford alleges that Board employees retaliated against her by entering false and defamatory allegations in Ms. Burford's personnel file and then providing copies of that file, including the false and defamatory statements, to DC DOC, which prevented Ms. Burford from returning to employment with the Department of Corrections.  *Id.* ¶¶ 115-119.

Acting *pro se,* Ms. Burford now brings all claims before the Court.  The Amended Complaint advances the following counts:

(Count 1) Violations of the ADEA, including harassment and retaliation allegedly committed by Ms. Love and Lt. Dublin (younger than age 40) and Admin. Sgt. Tillery-Fuller (over age 40), and discharge;

(Count 2) Sex-Based Discrimination in violation of Title VII, including harassment and retaliation allegedly committed by Ms. Love, Lt. Dublin and Admin. Sgt. Tillerly-Fuller, and discharge;

(Count 3) Disparate Treatment in violation of both Title VII and the ADEA, including a hostile work environment created by Ms. Love, Chief Dublin and Admin. Sgt. Tillery-Fuller; hostile interrogation by Chief Sauls and Ms. Hargo; release of her cell phone records by Chief Sauls and Agent Pleasant to other Board employees; and termination due to false allegations that Ms. Burford vandalized her own automobile and the automobile of a former Board employee;

(Count 4) Disparate Impact in violation of both Title VII and ADEA involving harsh name calling and various other illegal workplace hostilities;

(Count 5) Pervasive and Objectively Hostile Working Environment, involving deliberate aggression and hostility by Ms. Love, Lt. Dublin and Admin. Sgt. Tillery-Fuller; hostile interrogation by Chief Sauls and Ms. Hargo; dissemination of Ms. Burford's cellular records by Chief Sauls and Agent Pleasant; an effort by Agent Pleasant to force his way into Ms. Burford's home; vandalism of Ms. Burford's car; dissemination of confidential records by Ms. Hargo and Jade Mills-Little to the District of Columbia Department of Corrections and other prospective employers; and dissemination of Ms. Burford's confidential EEO file within the Board by Ms. Hargo and Ms. Mills-Little;

(Count 6) Retaliation Violations Under Title VII and ADEA, including false allegations by Ms. Love and Lt. Dublin;

(Count 7) Whistleblower Retaliation Under 18 U.S.C. § 1831j, involving Ms. Burford's disclosures of violations of clearly established law and abuses of authority that prompted "all of Plaintiff's allegations of retaliation contained within the complaint," Am. Compl. ¶ 258; and

(Count 8) Violations of the District of Columbia's Human Rights Act (DCHRA), DC Code § 2-1402.62 (2012), by numerous named and unnamed Board employees aiding and abetting one another "in orchestrating and executing a massive discriminatory and retaliatory scheme." Am. Compl. ¶ 265.

The Court construes Count 1 to allege age discrimination, *id.* ¶¶ 161, 171, 175; hostile work environment due to age, *id.* ¶¶ 163, 164, 165; and retaliation due to age, *id.*, ¶ 175. The Court construes Count 2 to allege a hostile work environment due to sex, *id.*, ¶¶ 182, 183, 184, 185, 188, 189, 191; retaliation due to sex *id.*; and wrongful termination due to sex. *Id.* ¶ 193. The Court construes Count 3 to allege disparate (less favorable) treatment due to age (ADEA), sex (Title VII), and retaliation, *id.* ¶ 199. The Court construes Count 4 to allege disparate impact because of age (ADEA) and sex (Title VII). The Court construes Count 5 to allege a hostile working environment because of age (ADEA), sex (Title VII), and retaliation. *Id.* ¶¶ 245, 246, 247, 248. The Court construes Count 6 to allege retaliation due to complaints of a hostile work environment under Title VII and the ADEA. *Id.* ¶ 229. The Court construes Count 7 to allege retaliation for whistleblower activities. *Id.* ¶¶ 257, 258. The Court construes Count 8 to allege that named and unnamed Board employees aided and abetted one another to discriminate and retaliate against Ms. Burford in violation of the DCHRA. *Id.* ¶¶ 265, 266.

Defendant has filed a motion to dismiss.  *See* Mot. to Dismiss [Dkt 17].  Ms. Burford opposes the motion [Dkt. 19] and the Board has replied [Dkt. 20].  Ms. Burford has also moved to strike the Board's Motion to Dismiss, [Dkt. 18], which the Board has opposed [Dkt. 21] and to which Ms. Burford has replied [Dkt. 23].

## II. STANDARDS OF REVIEW

### A. Failure to State a Claim Under Fed. R. Civ. P. 12(b)(1)

Defendant moves to dismiss Count 8[1] for lack of jurisdiction under Rule 12(b)(1). Federal courts are courts of limited jurisdiction, and the law begins with the assumption that "a cause lies outside this limited jurisdiction*." Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

---

[1] Defendant fails to articulate which counts she moves to dismiss under 12(b)(1) and which under 12(b)(6).  The structure of Defendant's Motion implies that she moves to dismiss Counts 1-6 under 12(b)(6).  *See* Mot. at 3 (stating that Counts I-VI "fail as a matter of law.").  Defendant also appears to be moving to dismiss Count 8, the DCHRA claim, for lack of jurisdiction under 12(b)(1).  *See* Mot. at 16 (moving to dismiss because federal government has not waived sovereign immunity from suit under the DCHRA).

Count 7 is a harder question.  Defendant moves to dismiss because the statute of limitations to bring claims under 12 U.S.C. § 1831j has expired.  *See* Mot. at 15.  When a statute involves a waiver of sovereign immunity, determining whether a related statute of limitations is jurisdictional, and subject to 12(b)(1), or substantive, and subject to 12(b)(6), requires a complicated analysis of the intent of Congress and the nature of the immunity waiver.  *See Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519, 524 (D.C. Cir. 2010).  A court has no authority to equitably toll a statute of limitations if that limitation is jurisdictional. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008).  Defendant only states that "[t]here is no basis whatsoever to support tolling" § 1831j's statute of limitations, and does not assert that this Court lacks jurisdictional authority to do so.  Accordingly, the Court will construe the Defendant's Motion to be moving to dismiss Count VII under 12(b)(6).  In any event, the Court finds that there is no basis for equitable tolling and that the statute of limitations has expired; the outcome under 12(b)(1) and 12(b)(6) is the same.  *See Smith-Penny v. SEC*, No. 16-1045, 2016 WL 7438657, at *1 (D.C. Cir. Dec. 14, 2016) (dismissing SEC whistleblower appeal filed after time limit without considering jurisdictional issue because "[e]ven if the time limit is not jurisdictional, petitioner has not presented any circumstances warranting equitable tolling" (internal citations omitted)).

Therefore, the Court construes Defendant to be moving to dismiss Counts 1-7 under 12(b)(6), and Count 8 under 12(b)(1).

375, 377 (1994); see also *Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).  On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction. *Marcus v. Geithner*, 813 F. Supp. 2d 11, 15 (D.D.C. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

"Because subject matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the Plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim." *Id.* (citing *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003)).

**B. Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6)**

Defendant also moves to dismiss Counts 1-7 for a failure to state a claim under Rule 12(b)(6).  A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Id*.  To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for

relief that is "plausible on its face." *Id*. at 570.  A court must treat the complaint's factual

allegations as true, "even if doubtful in fact." *Id*. at 555.  But a court need not accept as true legal

conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In deciding a

motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents

attached to the complaint as exhibits or incorporated by reference, and matters about which the

court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir.

2007).

### C. Summary Judgment under Fed. R. Civ. P. 56

In the alternative to its motion to dismiss, the Board moves for summary

judgment.  Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be

granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir.

2011).  Summary judgment is properly granted against a party who "after adequate time for

discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court gives the non-movant the

benefit of all permissible inferences that may be drawn from the facts alleged in the complaint,

and accepts the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255; *Talavera*, 638

F.3d at 308.  A nonmoving party, however, must establish more than "[t]he mere existence of a

scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. In addition, the

nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*,

164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that

would enable a reasonable jury to find in its favor. *Id*. If the evidence "is merely colorable, or is

not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

### III. ANALYSIS

Turning to what is certainly litigable, Ms. Burford timely alleged discrimination

under Title VII and the ADEA. Both statutes, and others, recognize that discrimination can be

shown by disparate treatment, which subjects an employee to unfavorable treatment compared to

others due to her race, color, creed, national origin, sex or age. Discrimination can also occur

when a facially-neutral policy unfairly affects ("impacts") one or more employees, because of

race, color, creed, national origin, sex or age. Ms. Burford asserts discrimination based on her

sex under Title VII and discrimination based on her age under the ADEA, relying on both

theories of disparate treatment and disparate impact. However, there are insufficient factual

allegations in the Amended Complaint to support either theory under Title VII or the ADEA.

In contrast, there are many material facts in dispute which preclude a decision on

Ms. Burford's claims of retaliation after she initiated EEO proceedings in August 2010.

Therefore, the Board's motion to dismiss will be granted in part and denied in part.

### A. Disparate Treatment Under Title VII and the ADEA

#### 1. Legal Standard

Title VII of the Civil Rights Act of 1964, as amended by Equal Employment

Opportunity Act of 1972, prohibits discrimination in the federal workplace, because of an

individual's race, color, sex, religion or nationality.[2]  Title VII prohibits a federal employer from making any "personnel decision[]" based on one or more of these attributes. *See* 42 U.S.C. § 2000e-16; *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015).  The "two essential elements of a discrimination claim" under Title VII are "that (1) the plaintiff suffered an adverse employment action (2) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  In addition, Title VII was amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m), specifically to provide a statutory basis for cases of "mixed-motive" discrimination (described below), albeit with limited remedies.

Similarly, the Age Discrimination in Employment Act (ADEA) prohibits discrimination against federal employees based on age.  *See* 29 U.S.C. § 623 (making it unlawful "to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age"); 29 U.S.C. § 633a (extending ADEA protections to most federal employees).  The "two essential elements of a discrimination claim" under the ADEA are "that [1] the plaintiff suffered an adverse employment action [2] because of the plaintiff's . . . age." *Baloch*, 550 F.3d at 1196.  Under both Title VII and the ADEA, a plaintiff can prove her case with either direct or circumstantial evidence.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)

However, there can be significant differences between proving a Title VII case and proving an ADEA case.  Title VII recognizes a "mixed-motive" theory of violation in which an employer had both permissible and impermissible reasons for its discriminatory action.  *See*

---

[2] See Equal Employment Opportunity Act of 1972, Pub. L. 92-261, sec. 10, § 715, 86 Stat. 103, 111 (codified as amended at 42 U.S.C. § 2000e-16).

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526 (2013) (discussing *Price*

*Waterhouse v. Hopkins*, 490 U.S. 228 (1989) and the effect of the Civil Rights Act of 1991, 42

U.S.C. § 2000e-2(m)). A mixed-motive is one in which the employee's protected class (race,

color, sex, etc.) "was *a motivating factor* for [the] employment practice, even though other

factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). Under Title VII,

therefore, there are both "single-motive" and "mixed-motive" theories of discrimination. *See*

*Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007).

   The ADEA is more complicated. The ADEA includes both a general

antidiscrimination section, § 623, and a section that covers federal employees, § 633a. The

Supreme Court interpreted § 623 in 2009 to preclude a mixed-motive theory of recovery and to

require a plaintiff to prove that her age was the "but for" cause of the alleged discrimination.

*Gross*, 557 U.S. at 175-80. The Court noted that the ADEA was not changed in 1991, when

Title VII was amended to codify a mixed-motive theory; the Court, therefore, interpreted the

ADEA statutory language to bar a mixed-motive cause of action for age discrimination. *Id.* at

174. Specifically, § 623 forbids an adverse employment action "because of" an individual's age.

29 U.S.C. § 623(a)(1); s*ee Gross*, 557 U.S. at 176. The Supreme Court interpreted this to mean

that the employee's age must be the "but for" reason (or "because of" reason) for the adverse

action. *Gross*, 557 at 177. As a result, "[i]t follows, then, that under § 623(a)(1), the plaintiff

retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's

adverse action." *Id.*

   Section 633a, however, does not include this "because of" language, and instead

simply states that "[a]ll personnel actions . . . shall be made free from any discrimination based

on age." The United States Court of Appeals for the District of Columbia Circuit has interpreted

that language to allow a mixed-motive theory under § 633a. *Ford v. Mabus*, 629 F.3d 198, 207 (D.C. Cir. 2010).[3]  However, while a plaintiff "may establish § 633a liability by proving that age was a factor in [her employer's] decision, thus entitling [her] to declaratory and possibly injunctive relief, it is insufficient to merit instatement and backpay.  For those types of remedies, a but-for standard of causation is necessary." *Id.*  This limitation is consistent with the law concerning mixed-motive Title VII claims.  *See Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008).

If a plaintiff cannot provide direct evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  The *McDonnell Douglas* framework applies as follows:  The plaintiff must first make a prima facie case (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination.  *Youssef v. FBI,* 687 F.3d 397, 401-02 (D.C. Cir. 2012).  The burden then shifts to the defendant, which must "articulate some legitimate, nondiscriminatory reason" for its action.  *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).  If it does, then the plaintiff must show by a preponderance of the evidence that the reason advanced by the employer was merely a pretext to hide discrimination.  *Id.*  If a jury does not credit the employer's permissible motive and finds that the real reason was discrimination, the employee has proved direct discrimination and is entitled to a full award of damages, including backpay,

---

[3] Some courts have questioned *Ford*'s continued applicability in light of the Supreme Court's subsequently-decided *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013).  S*ee Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir. 2013).  However, *Ford* remains good law in the D.C. Circuit.  *See, e.g., Joyce v. Office of Architect of Capitol*, 106 F. Supp. 3d 163, 168 (D.D.C. 2015) (applying *Ford* framework to § 633a claim).

reinstatement, compensatory damages, attorney's fees, and the like.  If, however, the jury credits

both parties and finds that the employer discriminated against the plaintiff but that it also had a

legitimate non-discriminatory reason for its action, the Civil Rights Act of 1991 limits the

plaintiff's recovery to a declaratory judgment of discrimination and attorney fees and costs, but

no backpay, compensatory damages or reinstatement.  *Ginger*, 527 F.3d at 1345.

   To prove a claim of disparate treatment, a plaintiff must first show that she

suffered an adverse employment action; and, as relevant here, that the adverse employment

action was based on her sex or age.  An "adverse employment action" is an established legal

term meaning "a significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing

significant change in benefits."  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (citing

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  "[N]ot everything that makes an

employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818

(D.C. Cir. 2001).  An employee must "experience[] materially adverse consequences affecting

the terms, conditions, or privileges of employment or future employment opportunities such that

a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d

1127, 1131 (D.C. Cir. 2002); *see also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)

(distinguishing between non-actionable "purely subjective injuries," and actionable "objectively

tangible harm").  An actionable adverse action "in most cases inflicts direct economic harm."

*Burlington Indus.*, 524 U.S. at 762.

   "If a plaintiff is able to produce direct evidence of discrimination, he may prevail

without proving all the elements of a prima facie case."  *Swierkiewicz v. Sorema N. A.*, 534 U.S.

506, 511 (2002) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

17

Direct evidence of discrimination may entitle a plaintiff to a jury trial irrespective of the employer's defense.

### 2. Retaliation Standard

Title VII and the ADEA also protect federal employees from retaliation for having asserted their rights. *See* 42 U.S.C. § 2000e-16(a); *Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008) ("§ 633a(a) prohibits retaliation against a federal employee who complains of age discrimination."). Ms. Burford alleges that she was retaliated against because of her protected EEO activities under both statutes. To prove retaliation for protected EEO activities under either statute, an employee must establish three elements: that (1) she made a charge or opposed a practice made unlawful by Title VII or the ADEA; (2) the employer took a materially adverse action against her; and (3) the employer acted "because of" her protected conduct. *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (citing *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)). After Plaintiff establishes the prima facie case of retaliation, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *see Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) ("A Title VII plaintiff [asserting unlawful retaliation] may raise a preliminary, circumstantial inference of prohibited motive through the burden-shifting framework of *McDonnell Douglas Corp.*")

Ms. Burford alleges that she engaged in "protected activity" when she complained of discrimination, starting in August 2010, irrespective of whether the discrimination was based on her sex or her age. At the point of a motion to dismiss, the Court need not decide whether an employee must allege, or a jury find, that a specific materially adverse action in retaliation for

protected activities was based solely on EEO claims of sex discrimination, solely on EEO claims

of age discrimination, or solely on claims of protected EEO activities for any protected status.

What is clear is that retaliatory conduct need not reach the same level of adversity

as discriminatory conduct to be actionable.  *See Mogenhan v. Napolitano*, 613 F.3d 1162, 1165-

66 (D.C. Cir. 2010) (citing *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 60-61

(2006)).  "Title VII's substantive [discrimination] provision and its anti-retaliation provision are

not coterminous" because the "scope of the anti-retaliation provision extends beyond workplace-

related or employment-related retaliatory acts and harm."  *Steele v. Schafer*, 535 F.3d 689, 695

(D.C. Cir. 2008) (quoting *Burlington N.*, 548 U.S. at 67).  Retaliatory conduct need be material

enough to "dissuade . . . a reasonable worker from making or supporting a charge of

discrimination."  *Mogenhan*, 613 F.3d at 1166 (quoting *Burlington N.*, 548 U.S. at 68).

However, material adversity requires "more than 'those petty slights or minor annoyances that

often take place at work and that all employees experience,'" because the EEO statutes are not

general laws of civil behavior in the workplace.  *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C.

Cir. 2013) (quoting *Burlington N.*, 548 U.S. at 68).

Despite this lessor standard, an employee must prove a retaliation claim according

to traditional principles of but-for causation.  *Univ. of Tex. SW Med. Ctr.*, 133 S. Ct. at 2534

(holding that "a plaintiff making a retaliation claim  . . . must establish that his or her protected

activity was a but-for cause of the alleged adverse action by the employer").  Thus, there is no

"mixed motive" retaliation.  Plaintiff is not, however, required to show that the protected activity

was the sole reason for her termination. See *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S.

273, 282 n.10 (1976) (holding that Title VII does not require plaintiff to "show that he would

have in any event been rejected or discharged solely on the basis of" the protected

characteristic); *Ponce v. Billington*, 679 F.3d 840, 846 (D.C. Cir. 2012) (finding "nothing in Title VII requires a plaintiff to show that illegal discrimination was the sole cause of an adverse employment action").

### 3. Plaintiff's Alleged Disparate Treatment

Ms. Burford's claims of disparate treatment fall into two separate categories of alleged activities:  those considered by the EEOC and those not.

Ms. Burford alleges discriminatory behavior arising from the conflicts with Ms. Love.  These interactions were deeply troubling to Ms. Burford, who attributes many of her later issues to the failure of Lt. Dublin to take any disciplinary action against Ms. Love.  *See* Am. Compl. ¶¶ 18, 19 ("It was unknown to Plaintiff at the time of her disclosure that Love and Dublin had conspired with one another to intentionally create a pervasive and objectively hostile working environment in an effort to force Plaintiff into a constructive discharge due to Plaintiff's sex and age.").  Nonetheless, the Amended Complaint contains no factual allegations that these conflicts, or the Board's handling of them, resulted in any "firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor*, 350 F.3d at 1293.  Ms. Love was a probationary officer with no authority over Ms. Burford, who was a Senior Lead, and neither their conflict, nor any alleged poor handing of the situation by supervisors, resulted in an adverse action affecting Ms. Burford.

Ms. Burford appears to argue that the seven weeks of daily standing assignments made by Sgt. Tillery-Fuller constituted "significantly different responsibilities," but she also acknowledges that standing posts are part of the normal duties of Senior Leads who must share the burden of those assignments.  These assignments do not support a charge of disparate treatment due to Ms. Burford's age or sex.

Employers may be liable for discrimination in the workplace if they are advised of discriminatory conduct and do nothing to stop it. *Cromer-Kendall v. D.C.*, 326 F. Supp. 2d 50, 63 (D.D.C. 2004) (denying summary judgment where employer knew of disruptive conduct but did not investigate). Therefore, for purposes of the legal analysis of Ms. Burford's allegations of discrimination, the legal issue is whether the Board, through its supervisors, properly handled complaints of discriminatory friction between two employees of different ages. But the Amended Complaint contains no factual allegations that might explain why the incidents between a junior and senior officer constituted more than inter-personal friction. Further, even if Lt. Dublin's handling of the conflict were sufficiently harmful to qualify as an adverse employment action, for which facts are not alleged, the Amended Complaint contains no fact allegations that would tie that his inaction to Ms. Burford's age or the difference between her age and his.[4] Ms. Burford attests that the incidents with Ms. Love, and her supervisors' failure to address them, were the onset of her discriminatory treatment, but, again, no alleged facts support an inference that either the antagonism exhibited by Ms. Love or Lt. Dublin's inactions were motivated by Ms. Burford's sex, age, or protected activity. The mere fact that Ms. Love and Lt. Dublin were younger than 40 while Ms. Burfurd was 50 is insufficient to make a causal connection as a matter of law. *Accord Howie v. Office of Eddie Bernice Johnson*, 570 F. Supp. 2d 115, 123 (D.D.C. 2008) ("[T]he mere fact that an older employee is replaced by a younger one does not permit an inference that the replacement was motivated by age discrimination." (quoting *La Montagne v. Am. Convenience Products, Inc.*, 750 F.2d 1405 (7th Cir. 1984)).

---

[4] To the contrary, the Amended Complaint itself suggests alternative motives—that Ms. Love was popular among LEU officers and that she and Lt. Dublin might have had a personal relationship. *See* Am. Compl. ¶ 19.

After alleged conflicts with Ms. Love over a period of months, Ms. Burford initiated EEO proceedings, whereupon she alleges she faced retaliation from her supervisors, most particularly Sgt. Michelle Tillary-Fuller.  Ms. Burford alleges that her post assignments between August and October 2010 obligated her to stand with a machine gun for her shifts, rather than work at seated posts that, as a lead officer, she was entitled to receive.  Ms. Burford's salary was not diminished, she was not demoted, and she was not required to perform duties outside the scope of her position.  "Purely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation, are not adverse actions." *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002) (citations omitted).  Ms. Burford has supplied no facts that would suggest that these assignments were motivated in any way by her sex or age, and therefore makes no cognizable claim of discrimination for this issue.  However, Ms. Burford alleges that Ms. Fuller knew of Ms. Burford's EEO activity prior to assigning Ms. Burford to these posts.  Am. Compl. ¶ 40.  Granting Ms. Buford, as non-movant, the benefit of all reasonable inferences from her Amended Complaint, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), it cannot be said that these standing assignments, over many weeks just after protected activity, were not potentially retaliatory.  The Court therefore will not dismiss claims of retaliation based on the duration of the standing assignments.

Ms. Burford also alleges that she faced further discrimination during the investigation into the alleged "leak" of a memo which she had written for the Board's purposes. In this instance, the alleged disparate treatment lay in aggressive questioning by Chief Sauls and Ms. Hargo.  Indeed, their questions and accusations may have been uncomfortable.  Despite that discomfort, there is no evidence of an adverse employment action associated with, or resulting from, that interview.  It did not result in administrative leave for Ms. Burford, demotion,

discipline, or any other adverse action.  Thus, albeit unpleasant, the one-hour interview session did not constitute discriminatory action by the Board on account of Ms. Burford's age, sex or protected activity.

Finally, Ms. Burford alleges a number of further activities that were not considered by the EEOC prior this suit.[5]  They include:  (1) that her car was vandalized and a note left on it that referenced her then-pending EEO activity; (2) that she was falsely accused of vandalizing her own car; (3) that she was falsely reported to federal and state prosecutors for alleged involvement in criminal activity; and (4) that she was falsely terminated for her alleged involvement in criminal activity.

Discriminatory vandalism of Ms. Burford's car at her home, malicious prosecution, and termination could well qualify as adverse employment actions, particularly as the first and second seem to have led to the third.  However, the question is moot.  Ms. Burford did not exhaust her administrative remedies before presenting these claims in court.  "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  This Court has followed the majority holding in this district that "[d]iscrete acts of discrimination and retaliation require discrete charges and an opportunity for investigation before litigation" and that "plaintiffs alleging discrete acts of discrimination or retaliation 'must exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others.'"  *Rashad v. Washington Metro. Area Transit*

---

[5] Ms. Burford acknowledges that the EEOC did not consider her termination.  She complains that Board Attorney Kuray prevented her from raising her termination to the EEOC.  Despite the argument, the exhibits attached to her Opposition fail to demonstrate timely contact to an EEO Counselor.

*Auth.*, 945 F. Supp. 2d 152, 166 (D.D.C. 2013) (Collyer, J.) (quoting *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 137-38 (D.D.C.2004)); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002).  As Ms. Burford has not exhausted the administrative process for these claims, the Court is without jurisdiction to consider them here.

Finally, Ms. Buford brings a separate count based on a hostile work environment. A hostile environment consists of multiple acts that "may not be actionable on [their] own" but become actionable due to their "cumulative effect." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115. The constituent acts must be "adequately linked" so that they form "a coherent hostile environment claim." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011).  For example, they might "involve the same type of employment actions, occur relatively frequently, and [be] perpetrated by the same managers." *Id*.  In addition, the acts must be "of such severity or pervasiveness as to alter the conditions of . . . employment and create an abusive working environment." *Hussain*, 435 F.3d at 366.  Severity and pervasiveness are determined by reference to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  The standard is an objective one. *Id.* at 21.

When considering the administratively-exhausted claims addressed by the EEOC, the alleged on-going conflicts between Ms. Love and Ms. Burford do not constitute an illegal hostile work environment.  The Amended Complaint presents no facts to tie these difficult interpersonal events to age or sex.  In addition, the allegations present a series of separate personal conflicts with different employees of the Board, none of which contains a germ of a connection to Ms. Burford's age or gender.  While these experiences may have been frustrating

for Ms. Burford, the Amended Complaint does not allege legally-cognizable actions that would give rise to a hostile work environment.

Because Ms. Burford has not met her pleading burden for her claims based on disparate treatment and a hostile work environment, Counts 1-3 and 5 will be dismissed.

### B. Disparate Impact

Facially neutral policies that have a disparate effect on particular groups of employees due, as relevant, to their sex or age can violate Title VII or the ADEA.[6]  "In order to establish disparate-impact discrimination, [a p]laintiff must show that a facially neutral employment policy or practice has a significant disparate impact on a protected class of which he is a member." *Jianqing Wu v. Special Counsel, Inc.*, 54 F. Supp. 3d 48, 53 (D.D.C. 2014), *aff'd*, No. 14-7159, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015).  "'[C]ommon sense and fairness dictate that [a plaintiff] must, at a minimum, allege some statistical disparity, however elementary, in order for the defense to have any sense of the nature and scope of the allegation." Id. (quoting *Brady v. Livingood*, 360 F. Supp. 2d 94, 100 (D.D.C. 2004)).  *See Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984) ("Statistical evidence is crucial in disparate impact cases, where plaintiffs need not prove discriminatory intent but must show that specific employment practices" affect certain groups of employees differently); cf. *Schuler v. PricewaterhouseCoopers, LLP*, 421 F. App'x 1, 2 (D.C. Cir. 2011) ("Finally, Schuler's disparate

---

[6] While private-sector plaintiffs typically bring disparate impact claims under the ADEA, there is uncertainty as to whether such claims are available against federal employers. *Aliotta v. Bair*, 614 F.3d 556, 570 (D.C. Cir. 2010) ("Although neither this court nor the Supreme Court has addressed the question whether the ADEA authorizes disparate impact claims against *federal* employers, we need not resolve the issue in this case . . . .").  The Board has not argued that it is not liable for discrimination due to alleged disparate impact. For the reasons described *infra*, the Court need not opine on this issue.

impact claim fails . . . because Schuler has not adequately alleged a facially neutral employment policy and thus his claim sounds only in terms of disparate treatment.").

The Amended Complaint does not identify a facially neutral policy or practice that allegedly led to a disparate impact on a protected class of Board of employees of which Ms. Burford is a member, or articulated what category(ies) of individuals are adversely impacted or in what fashion. Instead, the Amended Complaint alleges discrete instances of negative treatment towards Ms. Burford. As a *pro se* plaintiff, Ms. Burford may not appreciate the intricacies of Title VII law. Nonetheless, the allegation of disparate impact in the Amended Complaint, Count IV contains neither factual or legal support and must be dismissed.

### C. Whistleblower Protection

Ms. Burford brings a whistleblower protection claim under the 12 U.S.C. § 1831j(b), which was passed as a component of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and that applies specifically to federal bank regulatory employees. It operates separately from the primary federal Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8). This bank regulator whistleblower protection statute provides that "an employee or former employee who believes he has been discharged or discriminated against in violation of the statute may file a civil action in the appropriate United States district court before the close of the 2-year period beginning on the date of such discharge or discrimination." 12 U.S.C. § 1831j(b) (2012).

Unlike Ms. Burford's Title VII and ADEA claims, § 1831j does not require administrative exhaustion, and a plaintiff may sue at any time before the expiration of the two-year statute of limitations. As it is appropriate when considering a motion to dismiss, the Court gives the factual allegations in Ms. Burford's Amended Complaint the most favorable

26

interpretation. *Anderson*, 477 U.S. at 255.  Nonetheless, § 1831j is explicit that an affected employee must file her complaint within two years of the date of any retaliatory action due to whistleblowing activity.  As relevant here, Ms. Burford needed to allege whistleblower retaliation, at the latest, no later than March 1, 2014, which was two years after the effective date of her termination.[7]  Whistleblower claims under § 1831j are not tolled pending an EEOC administrative proceeding.  *See Richardson v. Yellen*, 167 F. Supp. 3d 105, 117 (D.D.C. 2016) (dismissing § 1831j claim as time-barred); *District of Columbia v. Proctor*, 74 F. Supp. 3d 436, 458 n.11 (D.D.C. 2014) ("The Supreme Court has held that the statute of limitations continues to run on a claim that requires no administrative exhaustion even while the plaintiff pursues administrative remedies on a separate claim that requires exhaustion." (*citing Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 465-66 (1975))).  Because Ms. Burford's initial complaint in this Court was filed on December 1, 2015, long after the statutory deadline, the Court will dismiss her whistleblower claim under § 1831j.

### D. District of Columbia Human Rights Act

Finally, Ms. Burford alleges a violation of the District of Columbia Human Rights Act (DCHRA).  *See* Am. Compl. ¶¶ 264-270.  Her claims notwithstanding, "[s]overeign immunity bars DCHRA claims against the federal government.  The D.C. Council, not Congress,

---

[7] The Defendant asserts that the appropriate date to start the clock is the date of the Plaintiff's notice of termination, December 8, 2011, not the termination's effective date.  *See* Mot. to Dismiss at 15-16.  The Plaintiff herself states in her Amended Complaint that she was "wrongfully terminated on December 8, 2011," Am. Compl. ¶ 103, and only in her Opposition asserts that she was terminated on February 29, 2012, Opp. at 1.  The Supreme Court has held that "an ordinary wrongful-discharge claim accrues—and the limitations period begins to run— when the employer notifies the employee he is fired, not on the last day of his employment." *Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016).  The correct date is therefore the date Ms. Burford received notice of her termination, December 8, 2011.  However, the statute of limitations has lapsed under both dates.

enacted the DCHRA, and there is no federal statute that evinces Congress's intent to waive the

United States' immunity from suit under the DCHRA." *Marcus v. Geithner*, 813 F. Supp. 2d 11,

17 (D.D.C. 2011).  This Court agrees.

Accordingly, the Board, which is a federal entity, has moved to dismiss Ms.

Burford's DCHRA claim for lack of jurisdiction, which the Court will grant.

## IV. MOTION TO STRIKE

In addition to her Opposition, Ms. Burford filed a Motion to Strike Defendant's

Motion to Dismiss in its entirety, citing Federal Rule of Civil Procedure 12(f) [Dkt. 18].  Rule

12(f) states that the Court "may strike from a pleading an insufficient defense or any redundant,

immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Ms. Burford argues that

"each of the Board's defenses is insufficient and is solely based on redundant, immaterial,

impertinent, and scandalous matter." See Pl.'s Mem. of Points and Authorities in Support of

Plaintiff's Mot. to Strike [Dkt. 18] at 1.  The Board opposes the motion, [Dkt. 21] and Ms.

Burford has replied [Dkt. 23].  "'The decision to grant or deny a motion to strike is committed to

the trial judge's sound discretion.'" *NCB Mgmt. Servs., Inc. v. FDIC*, 843 F.Supp.2d 62, 72

(D.D.C. 2012) (quoting *FTC v. Cantkier*, 767 F.Supp.2d 147, 159-60 (D.D.C. 2011)). "A court

has broad discretion in ruling on a motion to strike; however, striking portions of a pleading is a

drastic remedy, and motions to strike are disfavored." *Uzlyan v. Solis*, 706 F. Supp. 2d 44, 51

(D.D.C. 2010).

The critical question under the Rule is whether it applies to Defendant's motion to

dismiss at all.  Rule 12(f) states that a court may, where appropriate (but is not obligated to),

strike "pleadings."  "Pleadings" are defined in Federal Rule of Civil Procedure 7(a) as various

iterations of complaints, answers and replies to answers.  The definitions contained in Rule 7 do

not admit motions to dismiss as "pleadings."  Accordingly, federal courts in this District have ruled that Rule 12(f) does not apply to such motions.  "'[M]otions, affidavits, briefs and other documents are outside of the pleadings' and are not subject to being stricken." *Henok v. Chase Home Fin., LLC,* 925 F. Supp. 2d 46, 52-53 (D.D.C. 2013) (quoting 5C Charles Alan Wright et al., Federal Practice & Procedure § 1380 (3d ed. Supp. 2012)).  Even if the Board's motion to dismiss were subject to Rule 12(f), Ms. Burford's motion is largely duplicative of her Opposition and presents no independent basis to strike the motion to dismiss.   Accordingly, the Motion to Strike will be denied.

## V. CONCLUSION

For the reasons stated above, the Board's Motion to Dismiss will be granted in part and denied in part.  Allegations in Counts 1-3, discrimination and disparate treatment under Title VII and ADEA; Count 4, disparate impact under Title VII and ADEA; Count 5, hostile work environment treatment under Title VII; Count 7, whistleblower protection under 29 U.S.C. 1831j; and Count 8, protection under the DC Human Rights Act, DC Code § 2-1402.62, will be dismissed.  The allegations of retaliation in Count 6 based on Ms. Burford's weeks of assignment to standing posts will proceed to discovery.  Ms. Burford's Motion to Strike will be denied.

A memorializing Order accompanies this Memorandum Opinion.

Date: March 31, 2017                              _____/s/_____
                                                 ROSEMARY M. COLLYER
                                                 United States District Court