UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEBORA C. BURFORD, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 15-2074 (RMC) |
| JEROME H. POWELL, Chairman, Board of Governors of the Federal Reserve System, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

DeBora C. Burford sues her former employer, the Board of Governors of the Federal Reserve System, for retaliation in violation of Title VII and the Age Discrimination in Employment Act. She alleges that she was assigned to "non-critical" security posts rather than the "critical" ones to which she was entitled as a Lead Officer, in retaliation for her protected activity. The Board of Governors maintains that Ms. Burford's post assignments did not constitute materially adverse actions and even if they did, Ms. Burford cannot show the requisite causal nexus between her protected activity and the actions. Both parties move for summary judgment.[1]

---

[1] *See* Def.'s Mot. for Summ. J (Def.'s Mot.) [Dkt. 53] and Def.'s Statement of Facts (Def.'s SOF) [Dkt. 53-7]; Pl.'s Cross-Mot. for Summ. J. (Pl.'s Cross-Mot.) [Dkt 54]; Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J. [Dkt. 56]; Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Dkt. 57]; Def.'s Reply in Supp. of Mot. for Summ. J. (Def.'s Reply) [Dkt. 58]; Pl.'s Brief in Supp. of Cross-Mot. for Summ. J. [Dkt. 59].

1

## I. FACTS

### A. Factual History[2]

DeBora C. Burford was employed as a Senior Law Enforcement Officer (sometimes, LEO) for the Board of Governors of the Federal Reserve System (the Board) in its Law Enforcement Unit (sometimes, LEU) from 2002 until 2011. Def.'s SOF ¶ 1. In 2009 the Law Enforcement Unit instituted a program by which certain "exemplary" Law Enforcement Officers were designated as "Lead Officers" and routinely assigned to five "critical" security posts "in order to raise the standards of the Unit, improve performance, and to assist in establishing a positive rapport with Board employees." Def.'s SOF ¶ 3; *see also* Def.'s Mot., Ex. B, Lead Officer Program Description [Dkt. 53-2]; Pl.'s Cross-Mot., Ex. A, Deposition of Larence Dublin (Dublin Dep.) [Dkt. 54-1] at 50-51.[3] Participation in the Lead Officer Program was voluntary and did not involve any additional compensation or benefits. *See* Lead Officer Program Description; Def.'s Mot., Ex. D, Deposition of DeBora Burford (Burford Dep.) [Dkt. 53-4] at 46.[4] Lead Officers were expected to be able to handle posts independently, but they had

---

[2] Ms. Burford proceeds *pro se.* She filed no actual Statement of Facts with her summary judgment briefing. The section in her cross-motion for summary judgment titled "Statement of Undisputed Material Facts" comprises argument and legal conclusions and is largely unsupported by citations to the record. *See* Pl.'s Cross-Mot. at 3. Because Ms. Burford proceeds *pro se*, the Court will not deny her motion for procedural irregularity and addresses the merits.

[3] Each of Plaintiff's exhibits consists of multiple individual documents compiled into a single exhibit. Citations to Plaintiff's exhibits reference the document title, where applicable, and ECF page number.

[4] All citations to Ms. Burford's deposition transcription are from the deposition conducted on January 11, 2018.

no supervisory responsibilities. *See* Lead Officer Program Description; Burford Dep. at 54-56. Designation as a Lead Officer was, thus, not a promotion but a mark of distinction.

In November 2009, Lieutenant Larence Dublin notified Ms. Burford and 11 other LEOs by email that they had been selected for the Lead Officer Program for the day shift:

> Congratulations. You have been selected to serve as a Lead Officer on the Day Shift. Your supervisors selected you from a pool of applicants based on technical ability, the ability to work under pressure, and sound judgement [sic]. You will be rotated daily through the five critical posts . . . as well as non-critical posts.

Def.'s Mot., Ex. C, Lead Officer Selection Email [Dkt. 53-3]. Thus, the 12 new Lead Officers were assigned to both the five critical posts and other, non-critical posts. *Id*. The five critical posts were: the Board's Visitors Center (E1), East Court (E4), West Court (E5), Podium (M1), and South Garage (M8) locations. *Id.*; *see also* Burford Dep. at 36-37. It appears that the advantage to the critical posts may have been that the Officer was seated, and not standing; certainly there was more interaction with the other staff of the Board. In the late summer and early fall of 2010, post assignments were made by Sergeant Michelle Tillery-Fuller, the LEU Administrative Sergeant at that time. Def.'s SOF ¶ 9; Am. Compl. ¶¶ 40, 44.

In the summer of 2010, Lead Officer Burford and Law Enforcement Officer Sandra Love had two altercations. As Ms. Burford later complained, Ms. Love had used vulgar language in talking to Ms. Burford in December 2009, and then accused Ms. Burford of "bumping" her on July 23, 2010, and of "putting [her] butt in [Ms. Love's] face" on August 11, 2010. Def.'s Mot. to Dismiss, Ex. A, EEOC Decision [Dkt. 17-1] at 2 (describing Ms. Burford's allegations). At an unspecified time, Ms. Burford "filed her EEO complaint and LEU managers failed to address Love's aggressive and potentially violent behaviors." Am. Compl. ¶ 120. As a result of various disputes with Ms. Love, Ms. Burford testified that "what I did was basically just stayed to myself. I stayed to myself." Burford Dep. at 23. Ms. Burford further alleges, and

Defendant essentially admits, that from August 12, 2010 to October 7, 2010, Ms. Burford was assigned primarily to regular (standing) post duties and not to critical (seated) posts. *See* EEOC Decision at 2 (stating Ms. Burford's allegations); *see also* Pl.'s Cross-Mot., Ex. A, Deposition of Michelle Tillery-Fuller (Tillery-Fuller Dep.) at 79-80.

During the ensuing EEO investigation, several of Ms. Burford's fellow officers were interviewed in early 2011; Ms. Burford submits signed affidavits from these persons with her briefing. *See* Pl.'s Cross-Mot., Ex. A, Aff. of Shandra Love (Love Aff.) at 2-6; Aff. of Larence Dublin (Dublin Aff.) at 43-48; Aff. of Michelle Tillery-Fuller (Tillery-Fuller Aff.) at 66-69; Aff. of Franklin Williams (Williams Aff.) at 106-110; Aff. of Billy Sauls (Sauls Aff.) at 121-128. Several of these individuals were also deposed in the instant action. *See* Pl.'s Cross-Mot., Ex. A, Deposition of Shandra Love (Love Dep.) at 9-42; Deposition of Larence Dublin (Dublin Dep.) at 49-65; Tillery-Fuller Dep. at 70-88; Deposition of Melvin Barksdale (Barksdale Dep.) at 89-105; Deposition of Franklin Williams (Williams Dep.) at 111-120.

### B. Procedural History

Ms. Burford requested a hearing before an EEOC Administrative Judge (AJ). *See* EEOC Decision. The Board filed a motion for summary judgment, which the AJ granted, and the Board adopted the AJ decision as its own. *Id*. The EEOC affirmed the finding of no discrimination and no hostile work environment. *Id*.

Ms. Burford brought this lawsuit pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 § U.S.C. 2000e-16 *et seq*., and the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C. § 621 *et seq.* In an earlier Memorandum Opinion, this Court dismissed all but one of Ms. Burford's claims. *See* 3/31/17 Mem. Op. [Dkt. 24]; 3/31/17 Order [Dkt. 25]. Remaining is Ms. Burford's claim that she was retaliated against for her EEO activities when she was assigned to non-critical posts from August 12 to October 7,

2010.[5]  The parties have completed discovery and each has filed a motion for summary judgment.

## II.   LEGAL STANDARD

### A. Jurisdiction and Venue

The Court has jurisdiction over this matter under 28 U.S.C. § 1331, as the retaliation claim arises under the laws of the United States, specifically Title VII and the ADEA. Venue is proper in the District of Columbia because the Board is located in the District, Ms. Burford was employed at the Board in the District, and the relevant actions complained of occurred in the District.  *See* 28 U.S.C. § 1391.

### B. Summary Judgment

Both Ms. Burford and the Board move for summary judgment.  Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).  Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make

---

[5] Ms. Burford has exhausted her retaliation claim with respect to her assignment to "non-critical" rather than "critical" posts. *See* EEOC Decision.  She has not shown exhaustion of her claims regarding the alleged vandalism of her car, accusations that she vandalized her own car, alleged false reporting that she was involved in criminal activity, or alleged false termination based on that criminal activity. *See* Am. Compl. ¶¶ 83, 90, 91-100, 103, 104; EEOC Decision.  This Court follows the majority holding in this district that "[d]iscrete acts of discrimination and retaliation require discrete charges and an opportunity for investigation before litigation" and that "plaintiffs alleging discrete acts of discrimination or retaliation 'must exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others.'" *Rashad v. Washington Metro. Area Transit Auth.*, 945 F. Supp. 2d 152, 166 (D.D.C. 2013) (citation omitted).  The Court's inquiry is thus limited to the claim of retaliation for which Ms. Burford has exhausted her administrative remedies—the changes to her post assignments.

5

a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, a court gives the non-movant the benefit of all permissible inferences that may be drawn from the facts alleged in the complaint and accepts the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255; *Talavera*, 638 F.3d at 308. A nonmoving party, however, must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id*. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. Since both parties have moved for summary judgment, these principles will be applied only insofar as Ms. Burford, a *pro se* plaintiff, is given some leeway. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (noting that "[a] document filed *pro se* is 'to be liberally construed'") (citation omitted); *Hisler v. Gallaudet Univ.*, 206 F.R.D 11, 14 (D.D.C. 2002) ("[T]he court is mindful of the policy that an added measure of leniency is extended to *pro se* litigants respecting procedural requirements.").

### C. Retaliation Under Title VII and ADEA

Both Title VII and the ADEA prohibit employers from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see*

6

*also Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008) ("§ 633a(a) prohibits retaliation against a federal employee who complains of age discrimination"); *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) ("Title VII prohibits the federal government from . . . retaliating against employees for engaging in activity protected by Title VII.").

To prove retaliation for protected EEO activities under Title VII, an employee must establish three elements: that (1) she made a charge or opposed a practice made unlawful by Title VII; (2) the employer took a materially adverse action against her; and (3) the employer acted "because of" her protected conduct. *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008) (stating that a retaliation claim requires a plaintiff to "establish that [] she suffered (i) a materially adverse action (ii) because [] she had brought or threatened to bring a discrimination claim"). Retaliatory conduct need not reach the same level of adversity as discriminatory conduct. *See Mogenhan v. Napolitano*, 613 F.3d 1162, 1165-66 (D.C. Cir. 2010). In other words, "Title VII's substantive [discrimination] provision and its anti-retaliation provision are not coterminous" because the "scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

Instead of "affecting the terms, conditions, or privileges of employment," as must a discriminatory adverse action, retaliatory conduct needs to be materially adverse so as to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Mogenhan*, 613 F.3d at 1166 (quoting *Burlington N.*, 548 U.S. at 68). The material adversity standard requires "more than 'those petty slights or minor annoyances that often take place at

work and that all employees experience.'" *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Burlington N.*, 548 U.S. at 68).

Retaliation also differs from discrimination in its causation requirement: retaliation claims must be proved according to traditional principles of "but for" causation. *Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."). Thus, there is no "mixed motive" retaliation. *Cf. EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) (contrasting *Nassar*'s but-for standard in retaliation cases with the more "relaxe[d]" standard in Title VII's mixed-motive discrimination provision, 42 U.S.C. § 2000e-2(m)).

"Where a plaintiff attempts to prove unlawful retaliation in violation of Title VII using circumstantial evidence of motive, the burden-shifting framework of *McDonnell Douglas* ordinarily applies." *Burton v. Donovan*, 210 F. Supp. 3d 203, 212 (D.D.C. 2016) (citation omitted).[6] Under this framework, a plaintiff must first establish a *prima facie* case of retaliation, which then "trigger[s] the employer's burden to come forward with its actual, legitimate non-retaliatory reason for the challenged action." *Allen*, 795 F.3d at 39. If the employer comes forth with evidence of a legitimate, lawful reason for its action, the D.C. Circuit has instructed that the traditional *prima facie* analysis and burden-shifting framework of *McDonnell Douglas* fall away. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ("Lest there be any lingering uncertainty, we state the rule clearly: In a Title VII disparate-treatment suit where an

---

[6] Though the Supreme Court "has not squarely addressed whether the *McDonnell Douglas* framework . . . also applies to ADEA actions," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000), many jurisdictions, including this one, apply an analogous burden-shifting framework to the analysis of ADEA claims. *See Steele v. Mattis*, 899 F.3d 943, 945 (D.C. Cir. 2018); *Kwon v. Billington*, 370 F. Supp. 2d 177, 183-84 (D.D.C. 2005).

8

employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."). "Where, as here, 'an employer asserts a legitimate, nondiscriminatory reason for [a materially] adverse employment action,' the remaining question is 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'" *Minter v. Dist. of Columbia*, 809 F.3d 66, 71 (D.C. Cir. 2015) (quoting *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)). "At this juncture, plaintiff bears the burden of persuasion" and must "prov[e] that the [employer's] legitimate non-discriminatory reason is a pretext for discrimination." *Furey v. Mnuchin*, 334 F. Supp. 3d 148, 161 (D.D.C. 2018).

### III. ANALYSIS

There is no question that Ms. Burford engaged in protected EEO activity. Making a charge or opposing a practice made unlawful by Title VII or ADEA—here, Ms. Burford's allegations of age and sex discrimination—constitutes protected activity. *Allen*, 795 F.3d at 39. Thus, the issues are whether Ms. Burford's altered post assignments constituted materially adverse employment actions and, if so, whether her protected activity was the actual reason for that materially adverse action. At summary judgment, the latter question is framed as whether a plaintiff has provided evidence from which a reasonable jury could conclude that retaliation was the true motive for the materially adverse action. *See Brady*, 520 F.3d at 494.

### A. Changes to Post Assignments

Defendant agrees that Ms. Burford was assigned "mostly to 'non-critical' posts" from August 12 to October 7, 2010, Def.'s Mot. at 3,[7] but argues that those assignments did not comprise materially adverse actions.

"Purely subjective injuries, such as dissatisfaction with a reassignment, . . . or public humiliation or loss of reputation, . . . are not adverse actions." *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002) (citation omitted). In contrast, "reassignment with significantly different responsibilities, or . . . a significant change in benefits" generally indicates an adverse action. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). A materially adverse action is one that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 67-68 (citation omitted).

The description of the Lead Officer Program explicitly stated that it did not provide increased compensation or benefits or allow Lead Officers to supervise others. *See* Lead Officer Program Description [Dkt. 53-2]. The program was established to "take either the senior officers or the officers that displayed the most ability and put them in key or critical locations . . ." to improve contact with Board staff. Dublin Dep. at 51. The fact that a job description was created for the Lead Officer position, that candidates were selected for the position, and that they were rotated between the five critical posts and other posts indicates that Lead Officers had some different responsibilities than other officers. Additionally, Lieutenant

---

[7] The record is unclear regarding exactly how many non-critical and critical posts Ms. Burford was assigned between August 12 and October 7, 2010, but she was assigned at least one critical post in August. *See* Def.'s Mot., Ex. F, Work Scheduler for 8/15/10-8/21/10 [Dkt. 53-6] (showing that Ms. Burford was assigned to E4, a critical post, during that week).

Dublin explained that no one could be removed from the Lead Officer program without his knowledge and agreement.  Dublin Dep. at 55-56.

However, while twelve Lead Officers were selected to serve on the day shift, there were only five critical posts.  *See* Lead Officer Selection Email [Dkt. 53-3].  Obviously, all Lead Officers necessarily worked some combination of non-critical and critical posts.  *Id*.; *see also* Burford Dep. at 37.

There seems to have been little consistency in making assignments to the five critical posts.  Sergeant Tillery-Fuller was responsible for post assignments during the relevant period.  *See* Tillery-Fuller Dep. at 76; Tillery-Fuller Aff. at 67-68; Am. Compl. ¶ 40; Barksdale Dep. at 98-99.  She testified that Lead Officers rotated, that assignments were dependent on how many Lead Officers were available at the time of assignment, and that there was not a "set rotation."  Tillery-Fuller Dep. at 72-73.  Sergeant Melvin Barksdale, who was "sometimes" responsible for creating post assignment schedules, testified that post assignments were "just randomly picked," that it was "hard to explain," and that there was no written policy as to how post assignments were made "because everything rotates on a daily basis."  Barksdale Dep. at 94-96.  Sergeant Tillery-Fuller also said that, at some point, Lead Officers were assigned to a single critical post for one-week periods.  *See* Tillery-Fuller Dep. at 77.  In contrast, Lieutenant Dublin testified to his understanding that Lead Officers were assigned to a critical post for approximately one month at a time.  *See* Dublin Dep. at 51 ("I think we did monthly.  It may have been shorter, I don't know . . . I wanted to do it like a week but I remember getting resistance from above.").

Sergeant Tillery-Fuller agreed that Ms. Burford was assigned to only one critical post in a six-day span in August 2010 and that such assignment was not consistent with the spirit

11

of Lead Officer post assignments.[8]  Tillery-Fuller Dep. at 78.  It also appears that non-Lead Officers were assigned to critical posts on days that Ms. Burford, a Lead Officer, was assigned to non-critical posts.  *Id*. at 77.  Lieutenant Dublin testified that he "remember[ed] Ms. Burford asking me was she removed from the program.  Which I thought it was surprising because, with her being my selection, personal selection, you cannot remove her, or she can't be removed without my permission as the shift commander."  Dublin Dep. at 55-56.  Defendant concedes that Ms. Burford was scheduled mostly to non-critical posts between August 12 and October 7, 2010.  Def.'s Mot. at 3; Def.'s Reply at 2.

It is clear that the position of Lead Officer brought no additional compensation in pay or benefits.  It is also clear that Lead Officers regularly served at both critical and non-critical posts.  The selection as a Lead Officer, therefore, served as a mark of distinction and respect with regular assignments to (apparently) seated posts but nothing more.  It is a close question as to whether her assignments from August 12 to October 7 constituted a materially adverse action for Ms. Burford.  "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington N.*, 548 U.S. at 67.  The Supreme Court adopted the formulation of this test adopted by the D.C. Circuit:  "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (internal marks and citation omitted).

---

[8] Ms. Burford also proffers a document entitled "Senior Officer Debora Burford's Post assignments February 2, 2010 thru [sic] October 1, 2010."  *See* Pl.'s Cross-Mot., Ex. C at 5-6.  The provenance of this document is unclear, but it appears to show that Ms. Burford was assigned to more critical posts before August 2010, when her assignments to these posts dropped off significantly.  Because Defendant concedes this point, *see* Def.'s Mot. at 6, the Court need not address the document in more detail.

Although a close issue, the Court finds that the assignment of Ms. Burford to mostly non-critical posts from August 12 to October 7, despite her role as a Lead Officer, constituted a materially adverse action that might dissuade a reasonable person from further EEO activity. The constant string of assignments to non-critical posts was of sufficient duration to make it appear that Ms. Burford had been demoted. Dublin Dep. at 55-56. The loss of such a distinguishing position among her colleagues may well have dissuaded a reasonable worker from further protected EEO activity.

### B. Inference of Retaliatory Motive

Ms. Burford engaged in protected EEO activities at an unknown time in the summer of 2010. She had a loud dispute with Ms. Love on August 11, 2010 and was assigned predominately to non-critical posts from August 12 to October 7.[9] *See* EEOC Decision [Dkt 17-1] at 2. The Board concedes that Ms. Burford was thus assigned but asserts that her workplace communication issues were the cause, rather than retaliation, contemporary knowledge of which Sergeant Tillery-Fuller denies. *See* Tillery-Fuller Dep. at 78-81. In these circumstances, the Court finds that Ms. Burford's undated and unspecified EEO activity was sufficiently close to her allegedly adverse post assignments that a full analysis is warranted.

Sergeant Tillery-Fuller testified that "[Ms.] Burford wasn't communicating with people. I wouldn't put a person on a lead officer post that [sic] is not communicating with other people." *Id.* at 79. The Sergeant also testified that at times Ms. Burford was "standoff-ish, didn't want to be bothered with anybody, and things like that. And if you're the lead person, I

---

[9] Neither party has provided a precise timeline. The Court discerns from the record that, at latest, Ms. Burford reported her issues to EEO counselor Ms. Bruce before her altercation with Ms. Love on August 11, 2010. *See* Burford Dep. at 11-19. Defendant does not contest Ms. Burford's assertion or proffer an exact date for her initial contact with Ms. Bruce. *See* Def.'s SOF.

13

need you to communicate with my other officers . . . ." *Id*. at 79-80.[10]  Notably, the Lead Officer position required "good communication skills" and "excellent interpersonal and customer service skills." Lead Officer Program Description [Dkt. 53-2]. Sergeant Tillery-Fuller's observations about Ms. Burford are corroborated by Ms. Burford in significant part. *See* Burford Dep. at 23 ("Basically, what I did was basically just stayed to myself. I stayed to myself."). The testimony of other officers also indicates that Ms. Burford had conflicts with her co-worker and communication issues. *See* Williams Dep. at 112-16 (discussing an altercation between Ms. Love and Ms. Burford); Sauls Aff. at 124 ("She has had a history of problems with her co-workers but I thought her peer relationships had improved until I heard about the incidents with Officer Love."); Dublin Aff. at 45 ("I determined that the initial statement from Officer Burford [regarding an altercation with Ms. Love] was inaccurate and she misrepresented some facts. I questioned her about the inaccuracies in her statement and she made adjustments to clarify her statement. That incident marked the beginning of an ongoing feud between them. It gave me the feeling that Officer Burford was out to get Officer Love."); *id*. ("I reviewed the tapes of the East Court post to verify what both [Officers Love and Burford] had alleged . . . . Officer Burford's allegations were not true. The only person who was negligent in her duties was Officer Burford for not passing on the information.").

"[W]hen an employer comes forward with a legitimate, nonretaliatory reason for an employment action, 'positive evidence beyond mere proximity' is required 'to create a genuine issue of material fact concerning whether the motive for [a materially adverse action]

---

[10] Sergeant Tillery-Fuller did not preserve her thoughts about Ms. Burford's workplace communication issues in writing or address them with Ms. Burford because she was not Ms. Burford's supervisor and did not feel it was her responsibility. Tillery-Fuller Dep. at 80.

was . . . retaliation.'" *Minter*, 809 F.3d at 71-72 (quoting *Solomon v. Vilsack*, 763 F.3d 1, 16 (D.C. Cir. 2014)). One way to show retaliation is evidence that the employer's proffered reason is false. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *see also Czelaski v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007). Here, to the contrary, Ms. Burford and her fellow officers all support the Board's proffered rationale. "[N]ot communicating well" with others and being "withdrawn" or "stand-offish" after repeated altercations with a co-worker constitutes a legitimate non-retaliatory reason for not assigning Ms. Burford to critical posts which required communication and customer service skills. *See* Lead Officer Program Description [Dkt 53-2]; Def.'s Mot., Ex. E, Declaration of Michelle Tillery-Fuller [Dkt. 53-5] at 1. At some point in the summer of 2010, Ms. Burford "basically just stayed to [her]self" to avoid Ms. Love and others. Burford Dep. at 23. With Ms. Burford's admission that she withdrew to herself and no evidence to the contrary, Sergeant Tillery-Fuller's statement that Ms. Burford was not exhibiting necessary communication skills is conceded.

Ms. Burford relies upon the timing between her EEO activities and Sergeant Tillery-Fuller's change in her post assignment practices. Temporal proximity between protected activity and a materially adverse action can support an inference of causation, *Jones v. Bernanke*, 557 F.3d 670, 679-80 (D.C. Cir. 2009), although it "is not, by itself, always enough to survive summary judgment." *Allen*, 795 F.3d at 47; *see also Massaquoi v. Dist. of Columbia*, 285 F. Supp. 3d 82, 89-90 (D.D.C. 2018). Ms. Burford fails to give a date for the protected EEO activity on which she relies in her retaliation complaint. Defendant admits that "there is no dispute that she contacted a Board EEO counselor during the summer of 2010 and ultimately

filed a complaint of discrimination." Def.'s Mot at 5-6. The change in her assignments began on August 12, 2010, the day after her second altercation with Ms. Love. *See* EEOC Decision [Dkt.17-1] at 2.

However, Ms. Burford has not proffered any evidence that Sergeant Tillery-Fuller was aware of her EEO activity at that time. In fact, Sergeant Tillery-Fuller has sworn under oath that she was unaware that Ms. Burford had engaged in EEO activity until January 2011. Tillery-Fuller Aff. at 67 ("I recently heard about [Ms. Burford's prior EEO activity] this year in 2011. I don't know who brought it up. I believe I received something from the Board attorneys about it."). Again, Sergeant Tillery-Fuller's testimony is supported, at least in part, by Ms. Burford herself, who is quite frank that she never discussed her EEO charge with Sergeant Tillery-Fuller or told the Sergeant that Ms. Burford believed she was being retaliated against. Burford Dep. at 45. Ms. Burford could only say that it was "possible" that Sergeant Tillery-Fuller contemporaneously knew of her EEO activity, but she did not know one way or the other. *Id*. Additionally, Ms. Burford has testified that she did not discuss her EEO activity with others in the LEU and that no one told her they had heard about it. *Id.* at 22. The Court finds that Ms. Burford has failed to demonstrate that Sergeant Tillery-Fuller knew of her EEO activity in August 2010 and so therefore there is no basis for a jury to find that Sergeant Tillery-Fuller retaliated against Ms. Burford because of it. *See Talavera*, 638 F.3d at 313-14 (affirming summary judgment when decisionmaker denied knowledge of EEO activity under oath and plaintiff "offered only evidence from which a reasonable jury would have had to speculate that [the decision-maker knew] of the activity"); *Walker v. Children's Nat'l Med. Ctr.*, 236 F. Supp. 3d 136, 146 (D.D.C. 2017) (granting summary judgment where there was no evidence to rebut an employee's manager's affidavit of lack of knowledge); *Harris v. McDonald*, No. 17-594,

2017 WL 4217101, at *5 (D.D.C. Sept. 19, 2017) (finding "insufficient proof of retaliatory intent to warrant a trial" without evidence beyond speculation that decisionmakers knew of protected activity) (citing *Morris v. McCarthy*, 825 F.3d 658, 674 (D.C. Cir. 2016) (holding that "an employee cannot survive summary judgment if a jury can do no more than 'speculate' that her employer knew of her protected activity") (citation omitted)).

This Court ordered discovery on Ms. Burford's retaliation complaint because the timing of events was unclear and the full context was unknown. Even now, Ms. Burford does not identify the date of the protected activity upon which she bases her reprisal claim. However, the record is replete with references to Ms. Burford's communication issues and difficulties with her co-worker. *See* Sauls Aff. at 122-25; Dublin Aff. at 44-45; Tillery-Fuller Aff. at 68-69; Love Aff. at 3-6; Barksdale Dep. at 94-95; Williams Dep. at 112-16. While Ms. Burford alleges that her fellow employees, across varying levels of seniority, conspired against her, Am. Compl. ¶¶ 19, 38-40, there is no evidence to support such a claim.

Ms. Burford has proffered only temporal proximity to support her assertions that her protected EEO activity was the "but for" cause of Sergeant Tillery-Fuller's post assignments. Despite her argument, she has no evidence that Sergeant Tiller-Fuller knew about her protected EEO activity in the fall of 2010, when the contested assignments occurred. Ms. Burford fails to show that the Board's reason for its actions—her communication problems and ongoing disputes with a co-worker—is pretextual. To the contrary, Ms. Burford's own testimony provides support for that rationale, as does the testimony of other Law Enforcement Officers. In light of the entire record after discovery, Ms. Burford's arguments fail. *See Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however

egregious, would support summary judgment for the employer in a subsequent retaliation claim."); *Anderson*, 477 U.S. at 256 (noting that a plaintiff cannot "defeat [a] properly supported summary judgment motion . . . without offering any significant probative evidence tending to support the complaint") (citation omitted).

Because Ms. Burford has failed to produce evidence from which a reasonable jury could find that Sergeant Tillery-Fuller knew of her protected activity or that the true motive for her contested post assignments was protected activity, her cross-motion for summary judgment will be denied and Defendant's motion for summary judgment will be granted.

## IV. CONCLUSION

Defendant's Motion for Summary Judgment, Dkt. 53, will be granted. Plaintiff's Cross-Motion for Summary Judgment, Dkt. 54, will be denied. A memorializing Order accompanies this Memorandum Opinion. This case is closed.

Date: February 26, 2019

ROSEMARY M. COLLYER
United States District Judge